Keeler, J.
The question for decision arises upon demurrer.
The petition in this case alleges that the county commissioners, on the 13th day of June, 1908, levied, among other taxes, five-thousandths of a mill for the “bridge fund”; that there has been collected in the city of Cleveland, as the avails of said tax, the sum of $70,000 approximately; that the defendants are about' to pay one-half of said sum to the city of Cleveland, which said action, it is said, would be unlawful and would constitute a misapplication of public moneys of the county. On these premises an injunction is asked.
*322 The contention of the plaintiff is, that the provisions of Section 2824 of the Revised Statutes, providing for the payment of one-half of the avails of the tax levied by the county commissioners for the bridge fund to cities is unconstitutional, as being special legislation. It therefore becomes necessary to examine the history of the various sections dealing with this subject. '
Section 860, Revised Statutes, reads as follows:
“The county commissioners shall construct and keep in repair all necessary bridges over streams and public canals on all state and county roads, free turnpikes, improved roads, abandoned turnpikes and plank roads in common public use, except only such bridges as are wholly in such cities and villages having by law the right to demand and do demand and receive part of the bridge fund levied upon property within the same; and when they do not demand and receive said portion of the bridge tax, the commissioners shall construct and keep in repair all bridges in such cities and villages.”
In the 69th O. L., at page 61, we find this section in substantially the form quoted. It has, however, been repeatedly amended, and the proviso which now stands at the end of the section and has no particular bearing here was added in the 91st O. It., at page 19. This section, it will be observed, imposes upon the commissioners the duty to construct and keep in repair all necessary bridges of a specified kind, except in cities and villages which by law have the right to demand and do demand and receive a portion of the bridge tax. This bridge tax is levied under Section 2824, Revised Statutes, and the first appearance of that section necessary to be noted here occurs in the 73d O. L., at page 149, where it is provided that the county commissioners shall have authority to levy a tax of a specified amount, which shall be set aside and be called a bridge fund. The section then proceeds to say that the tax “shall be collected in money and expended (except as may be otherwise provided by any local law heretofore enacted), under the direction of the commissioners of the county, in the building or repairing of bridges and culverts, or both, in their respective county. # * *' Provided, further, that nothing herein contained shall affect the right of city councils to receive and expend a portion of the levy herein as authorized by Section 641 of the municipal code.”
*323 The 641st section.of the municipal code referred to is found in the 66th O. L., at page 257. It provides that each city and incorporated village shall have the power to levy annually, in addition to certain other taxes authorized by Section 640, the following rate: “for keeping up and maintaining bridges,.one-half of one mill. ’ ’ There is, however, in this section, no suggestion of any right to get this money from the county commissioners, so that at the time of the passage of the municipal code of 1869, Section 641 authorized the city to make a levy for bridge repairs directly.' When the act of 1876 was passed (73 O. L., 149), the intention plainly was, that the county commissioners should make a uniform levy throughout the county for this purpose, and that the city, instead of making its levy' as authorized by Section 641 of the municipal code, should receive from the county commissioners one-half of all the taxes levied by them for bridge purposes, so far as it was collected from property inside the city limits. The confusion existing by the failure of this law to be explicit was remedied by an amendment to the municipal code passed the year after its original adoption (67 O. L., page 83), where Section 641 of the municipal code is amended and the provision relating to the bridge tax is as follows:
‘ ‘ 9. For keeping up and maintaining bridges one-half of one mill, provided that in all cities except cities of the first-class that have been advanced to that grade since I860,- one-half of the portion of bridge tax levied by the county commissioners collected upon property within such cities, in all cases where the city council shall demand it, shall be paid into the city treasury, and shall be expended by such cities for the purpose -of building and repairing bridges.”
It is quite plain that the Legislature regarded the levying of a tax for bridge purposes as a subject to be regulated by general law. In this there can be no doubt that the Legislature was right. The Supreme Court of this state has affirmatively so held in the case of State v. Davis, 55 O. S., 15; but the Legislature as plainly felt that, after the collection of the bridge tax, the selection of the agency for its expenditure was a local question, to be determined by the practical expediencies of the situation as *324 they existed from place to place. They therefore provided that cities might demand, and, when they did demand, should receive a portion of the bridge tax collected from property inside the corporate limits wherever in the judgment of the council it was wise so to do. The law was uniform in its operation. The putting into effect of the law depended upon the determination of the council of the particular city as to whether or not, in its judgment, it was wiser to have the city assume control of bridge repairs or the county. Very many amendments have been made to these two sections, but it is unnecessary to examine the stages by which they were brought into their present condition. The basal principle appears from their history as thus far traced.
'In addition to the sections examined, Section 4938 of the Revised Statutes deals with this subject, and provides:
“The commissioners of the several counties shall cause to be constructed and kept in repair, in the manner prescribed by law, all necessary bridges in villages and cities not having the right to demand and receive any portion of the bridge fund levied upon property within such corporations, on all state, and county roads, free turnpikes, improved roads, preserved and abandoned turnpikes and plank roads which are of general and public utility, running into or through any such city or village. ’ ’
This section, likewise, was brought into the statutes at the time of the adoption of the municipal code in 1870 (69 O. L., 61).
These three sections of the statutes have therefore been in practical operation for nearly forty years. They have been repeatedly considered and passed upon by the courts. Thus, in Perry County v. The Railroad, 43 O. S., 452, it was held that the board of county commissioners of Perry county had a right of action against the N. S. & S. Railroad Company for the construction of a bridge made necessary by the railroad construction in the village of Somerset, for the reason that the village of Somerset did not have a right to demand and receive a part of the bridge fund; and by an exactly similar process of reasoning in the case of County Commissioners v. Railroad Company, 45 O. S., 401, it was held that the county commissioners of Mahoning county could not maintain an action against the railroad company for damages to a bridge built by the county commissioners within the limits of the city of Youngstown, for the reason that *325 the city of Youngstown did have the right to demand and receive a part of the bridge fund, and therefore the county commissioners had no obligation to repair the bridge injured by the railroad company, and could not expend the money on it if they were permitted to recover. In both of these cases the Supreme Court expressly examined Sections 860 and 4938, and applied them as fixing the liability of railroad companies and the powers of county commissioners and municipal corporations. It seems venturesome at least to suggest that the Supreme Court has allowed as grave and important public rights as were involved in these cases to be determined by the application of unconstitutional statutes which, if the court had pointed out to be unconstitutional, would have decided both eases the other way. Similarly, in the case of Mooney, Administrator, v. St. Marys, 15 C. C., 446, Judge Price, now of the Supreme Court, then circuit judge, examines and compares all the sections which we have under examination here, together with Section 2640, Revised Statutes, which imposes upon municipal corporations the duty of keeping their highways and bridges open, in repair and free from nuisance. The court holds that the duty to repair the defective bridge in the village of St. Marys which caused the injury was upon the county commissioners, for the reason that the village of St. Marys did not have the right to demand and receive a part of the bridge tax, but holds that Section 2640 imposed an additional obligation upon municipal corporations of such character that the particular defect complained of should have been cared for by the village authorities so as to prevent the death of Mooney’s intestate. In the case of State, ex rel, v. Cincinnati, 4 N. P., 313, these sections were examined and their history to some extent set out. It was expressly held that the state had the right to demand and receive a part of the bridge tax, and was under an obligation to expend it in repairing bridges constructed by the county commissioners within the city limits. In the ease of State, ex rel Mt. Vernon, v. Board of County Commissioners, 4 N. P., 343, the provisions of Section 860 and Section 2824 are compared and examined, and the power of cities to demand and receive a part of the bridge tax is sustained.
I have not undertaken to cite all the cases construing these provisions, but what I have cited are enough to show that for *326 forty years the courts of this state have been sustaining these provisions, and that they were passed by the Legislature long before the system of classification for the purpose of giving corporate powers had attained the proportions which led the Supreme Court to overthrow it.
The attack which is made upon the receipt by the city of a portion of the bridge fund collected by the county commissioners is based upon the decisions of the Supreme Court of Ohio in the eases of State, ex rel Knisely et al, v. Jones et al, 66 O. S., 453, and State, ex rel Attorney-General, v. Beacon et al, 66 O. S., 491. It is important to have clearly in mind just what these cases decided. In the second paragraph of the syllabus in the Knisely case it is said: ‘ ‘ Since all the acts relating to the classification of municipalities, and their reclassification, and the division of classes into grades, evince the legislative intention that municipalities having substantially the same conditions and characteristics shall not enter and remain in the same class, such acts are ineffectual to designate classified recipients of corporate powers; and an act to confer such corporate power upon a single city, by such classification, is repugnant to Section 1 of Article XIII of the Constitution, which ordains that: ‘the General Assembly shall pass no special act conferring corporate powers.’ ” The exact point in controversy in this case was as to whether an act providing for the organization and support of a police force for the city of Toledo conferred corporate power. The court held that it did; that the requirement of the Constitution, that the General Assembly shall provide by general laws for the organization of cities, might probably mean that there could be but one class of cities, but they refrain from deciding that, and rest their decision solely upon Section 1 of Article XIII of the Constitution, above cited.
In the case of State, ex rel, v. Beacon et al, the point in controversy was, whether the so-called special government act for Cleveland was constitutional; and it was held that, since the act conferred corporate power and was a special act, it was therefore unconstitutional.
Now, the sections under examination do not confer corporate power. The power to build and repair bridges is plainly com ferred upon all municipalities in the state of Ohio by Section *327 1536-100-18 of the Revised Statutes, and the duty so to do; and the implied corporate power to perform the duty is plainly contained in Section 1536-131, a section which replaced former Section 2640, Revised Statutes. In other words, the corporate power of the city of Cleveland to build and repair bridges is fully and entirely conveyed by statutes of general application to all cities in the state of Ohio, not special in their character, and of admitted constitutionality. The statute has provided, in addition to this, that certain revenues, raised by county commissioners under authority of statutes of general application, shall be paid over to the city to be used by the city in the exercise of those corporate powers already possessed by it, whenever in the judgment of the city a wiser scheme for the improvement and repair of bridges can be made by having the city do it than by having it done directly by the county commissioners. My contention with regard to this is, that it does not confer corporate powers, but is simply a rule of convenience in the prosecution of public improvements, and that the Supreme Court has by analogy recognized the propriety of such statutes since the decisions in the Knisely and Beacon cases. Thus, when Section 2819-1 was passed by the Legislature, it provided that, upon the written application'of the county auditor of any county to the state board of appraisers and assessors for the appointment of a board of review for any municipal corporation of such county, the board of appraisers should make the appointment. This act did not confer corporate power, nor did it deprive some cities of corporate power left in other cities. Under the .operation of that act there are cities in the state of Ohio that appoint their own boards of equalization. There are other citiés which do not appoint boards of equalization, but, instead, the state board of appraisers and assessors appoint a board of review for them. There is no question of corporate p'ower here; it is a question of the agency through which uniform corporate powers are exercised. All cities in the state have the power to equalize taxes through some agency or instrumentality, and the diversity in these agencies does not constitute either the giving or the withholding of corporate powers. Section 2819-1 of the Revised Statutes has been held by the Supreme Court to be a constitutional enactment: Similarly, the Supreme Court has sustained the *328 Jones, Brannock and Beal local option laws, under which sections all the cities of the state are determined as to their status without being subject to the operation of a general statute with a provision on the subject; that is, all sections of the state have a right to be wet or dry, as they see fit. Some of them determine it one way, some of them the other. This option the Supreme Court holds to be within the Constitution. Similarly, in Ohio all cities have the right to build and repair bridges. Whether or not they will demand and receive from the county a portion of the bridge fund to be used for that, is left optional with the city, and it is left optional in varying degrees with different kinds of cities, as their local condition determines.
It should be remembered that the Supreme Court has^ never said that the Legislature of Ohio can not pass a local .law; on the contrary, it has repeatedly said that the Legislature has the power to make all laws; that those which are general in their nature must be uniform in their operation, but where a special condition exists which justifies a local law, the Legislature has undoubted power to make it. It would be difficult to imagine a subject upon which local conditions could differ more widely than upon the subject of bridges. There must be many counties in Ohio entirely rural in their conditions, with no large rivers, and therefore no bridges expensive either to build or repair, where the whole duty is but a part of the county commissioners’ general supervision of county roads. On the other hand, there are many counties bordering on great rivers, or having great rivers running through them, and with congested city populations, where it is necessary to build very expensive bridges, and to keep them in a state of much more efficient repair. So that, in the selection of the agency which is to expend the proceeds of the property tax authorized to be levied, there is no conceivable reason why the Legislature might not do so by local laws, and it did so from the earliest years after the adoption of the present Constitution.
Section 1209a of the Revised Statutes provides "that the coroner in all counties having a city of the first class of the second grade may appoint a deputy coroner, who shall have power to do and perform all duties imposed by law upon the coroner of said county, in his absence, at a salary of fifteen hundred dollars *329 per annum.” etc. This statute was recently attacked in this court on the ground of its unconstitutionality, the claim having been made that it was special legislation and in violation of that constitutional provision which provides that all laws of a general nature shall have uniform operation throughout the state. The statute, upon its face, on first thought, appears to be special legislation, but this court maintained that it was constitutional upon the ground of special conditions which existed in Cuyahoga county, making the appointment of a deputy coroner necessary; and the circuit court held that a deputy coroner was not necessarily a public officer, but merely an employe.
In the 66th O. S., at page 77, the Supreme Court uses this language:
‘1 There is nothing in the Constitution of Ohio which prohibits legislation on a subject which would otherwise be general, when such legislation is designed to meet a,temporary emergency in a particular, locality or in regard to a particular person, provided such legislation does not confer corporate powers. Por, while it must be conceded that the tenor of the whole Constitution seems to forbid special legislation under most conditions, it can not be successfully maintained that it is absolutely prohibited under all circumstances. It would have been unwise to have left the General Assembly powerless to act in unforeseen exigencies. Hence, while it is provided that all laws of a general nature shall have uniform operation throughout the state, if it had been intended to prohibit absolutely all special legislation, it would have better expressed that intent to have said that all laws shall have a uniform operation throughout the state; and, instead of providing that the General Assembly shall pass no special act conferring corporate power, it would have been said that the General Assembly shall pass no special laws. The inclusion of the qualifying words must, be presumed to have been deliberate and intentional.”
It is manifest from this opinion that the only constitutional limitation on the General Assembly in regard to the passage of special laws refers to the passage of special laws which confer corporate powers; and, as already stated, the sections under consideration do not confer such powers. It could never have been the intention of the people of the state, in adopting the Constitution, to so tie the hands of the Legislature as to prevent them from passing local or special laws, no matter how great the neces *330 sity for such, laws might be. It is clear from these considerations, therefore, that the framers of the Constitution intended to leave the General Assembly perfectly free to meet, by the passage of special legislation, such a situation .as we find here.
In the 29th O. S., at page 102, it was held that an act to regulate the police force in cities (which could apply only to the city of Cincinnati), did not violate the provisions of Section 26 of Article II, the court saying that the enactment was essentially local and special in its nature, but that it was appropriate legislation to meet the existing situation.
The Legislature passed an act to compensate a citizen for a loss sustained by reason of an unauthorized levy on his property. It was contended in 35 O. S., 435, that the act violated the provisions of Section 26, Article II of the Constitution, but the court, at page 443, said:
‘1 The objection suggested in argument, that the relief, if granted at all, should have been granted by a general law, is not well taken. The subject-matter of the act is of a local and temporary nature; and where the statute granting the relief does not confer corporate power, it may be a special act. ’ ’
The General Assembly has at every session freely passed local and special laws when it believed that the necessity for such legislation existed. The index to local and special acts passed between 1880 and 1900 covers 216 pages in the Sixth Edition of Bates’ Statutes, and these special acts refer to almost every public matter of a local nature from the building of bridges to regulations concerning a graveyard. And yet in very few instances have the courts been asked to even pass on the constitutionality of these acts. The people of the state,_ the General Assembly and the courts have recognized the fact that distinct local conditions and circumstances prevail in different parts of the state, and that it is often absolutely necessary to provide for such conditions by special laws.
Our Supreme Court has furnished the rule by which the.constitutionality of a statute is to be determined. I find this language in the case of Kelly v. State, 6 O. S., at page 272:
‘ ‘ The -character of a law as general or local depends on the character of its subject-matter. If it be of a general nature, ex- *331 i'sting throughout the state, in every county, a subject-matter in which all the citizens have a common interest, then the laws which relate to and regulate it are laws of a general nature, and, by virtue of the prohibition referred to, must have a uniform operation throughout the state,”
I do not understand it to be contended by counsel that the statute under which this sum of $70,000 has been collected is unconstitutional, but, rather, the -attack goes to the right of the city to demand and of the county treasurer to pay over said sum. Can it be said that the right of the city to demand this money, or of the county treasurer to pay it over to the city, to be used in the construction and repair of city bridges, is of a general nature existing throughout the state in every county, a subject-matter in which all the citizens have a common interest ? I do not think so. The agency through which this money is to be expended is a matter, in my judgment, of total indifference to the people throughout the state.
There is only one other point that was suggested in the oral argument in this case,. and it is insterted here for completeness.
Under Section 2824, the county commissioners- have already levied a tax, and they have in their treasury the proceeds resulting from the levy of that tax. These proceeds constitute -a trust fund to be expended for the purposes for which the tax was levied. They can not be expended for any other purpose. We have, therefore, a very different situation from what might be said of the case where a tax-payer was seeking to enjoin the levying of a tax under Section 2824. The tax is already levied, the money is in the treasury of the county commissioners. If it can not be expended 'for the purpose for which it was collected,it can not be expended at all. So that it is reasonable to contend that the prosecuting attorney has waited too long in the bringing of this action. He is estopped from- enjoining the expenditure of the money for the purpose for which it was collected, even if it might be said that he could originally have enjoined the collection.
The demurrer will therefore be sustained.